IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| In re:<br><br>**TALEN ENERGY SUPPLY, LLC,** *et al.*,<br><br>Debtors.[1]<br><br>------------------------------------------------<br><br>**TALEN MONTANA, LLC** as debtor in possession,<br><br>Plaintiff,<br><br>v.<br><br>**PPL CORP., PPL CAPITAL FUNDING, INC., PPL ELECTRIC UTILITIES CORP., AND PPL ENERGY FUNDING CORP.,**<br><br>Defendants.<br><br>------------------------------------------------ | Chapter 11<br><br>Case No. 22 – 90054<br><br>(Jointly Administered)<br><br><br><br>Adversary Proc. No. 22 – _____ |

**PLAINTIFF'S ADVERSARY COMPLAINT**

  Talen Montana, LLC, as debtor in possession (f/k/a PPL Montana, LLC) ("**PPL Montana**," "**Talen Montana**," or "**Plaintiff**"), as Plaintiff in the above-captioned adversary proceeding (the "**Adversary Proceeding**"), hereby files this adversary complaint (the "**Complaint**") against PPL Corp. ("**PPL**"), PPL Capital Funding, Inc. ("**PPL Capital Funding**"), PPL Electric Utilities Corp. ("**PPL Electric Utilities**"), and PPL Energy Funding

---

[1] A complete list of debtors (collectively, the "**Debtors**") in these chapter 11 cases may be obtained on the website of Debtors' proposed claims and noticing agent at https://cases.primeclerk.com/talenenergy. Debtors' primary mailing address is 1780 Hughes Landing Boulevard, Suite 800, The Woodlands, Texas 77380.

**PLAINTIFF'S ADVERSARY COMPLAINT – Page 1 of 18**

Corp. ("**PPL Energy Funding**") (collectively, "**Defendants**"), and in support states the matters set forth below.

## I. INTRODUCTION

1. Talen Montana brings this action for actual fraudulent transfer and constructive fraudulent transfer for the benefit of the estate of PPL Montana (now Talen Montana) to avoid transfers (in the form of dividends and other distributions) of nearly $900 million in cash to the Defendants, which were at the time PPL Montana's parent companies. As detailed herein, Defendants orchestrated the transfers with knowledge that PPL Montana faced hundreds of millions of dollars of liabilities and PPL Montana's remaining assets had no means to satisfy these liabilities.

2. In December 1999, after Montana deregulated its electricity market, PPL, a Pennsylvania-based utility, acquired Montana Power Company's ("**MPC**") generating assets in Montana. PPL Montana was the entity PPL used to acquire the assets. For a time, PPL enjoyed historically high electricity prices that followed deregulation of Montana's electric power market, extracting substantial profits from its Montana operations, including through energy sales to MPC and later NorthWestern Corp. ("**NorthWestern**"). PPL then transferred that value, totaling at least $325 million through 2012, from PPL Montana to PPL and its affiliates.

3. By 2012, however, the electricity market in the Pacific Northwest had weakened, and PPL Montana was no longer contributing significant profits to PPL. In fact, PPL Montana was, at best, a break-even operation with a deteriorating financial outlook. Moreover, it faced mounting liabilities due to environmental remediation obligations connected to its coal-fired assets, particularly with respect to the four-unit Colstrip coal-fired power plant in southeastern Montana ("**Colstrip**"), as well as significant pension-related liabilities.

4. At the same time, PPL needed money for operations outside of Montana. In 2010 and 2011, PPL had taken on significant debt to fund approximately $13 billion in acquisitions in Kentucky and the United Kingdom. Given the declining Montana profits and the debt burden from these acquisitions, Defendants developed a plan to extract the remaining value out of PPL Montana by selling its Montana-based hydroelectric facilities and transferring the proceeds of the sale to PPL. In November 2014, PPL Montana completed a sale of its hydroelectric assets to NorthWestern for approximately $900 million and immediately distributed the proceeds, net of taxes, out of PPL Montana and up through its chain of ownership to PPL and its wholly-owned subsidiaries (the "**Distribution**").

5. By extracting this value from PPL Montana and disregarding PPL Montana's substantial liabilities, Defendants rendered PPL Montana insolvent and unable to fund its significant obligations—both for environmental remediation, as well as obligations to other creditors such as its employees' and former employees' pension plan. Following the sale, all that remained at PPL Montana were its coal-fired assets, which are projected to generate negative cash flows for the foreseeable future and are burdened with substantial environmental and other liabilities. Despite the projected losses in PPL Montana's five-year business plan, PPL failed to perform a solvency analysis before making the Distribution.

6. The extraction of value out of PPL Montana—which was executed by PPL, PPL Capital Funding, PPL Electric Utilities, PPL Energy Funding, and PPL officers, directors, and employees with control over PPL Montana—constitute a fraudulent transfer, both actual and constructive.

7. Until June 1, 2015, PPL Montana was a wholly-owned indirect subsidiary of PPL. On June 1, 2015, as the result of a spin-off transaction (the "**Spin-Off**"), PPL Montana became a

**PLAINTIFF'S ADVERSARY COMPLAINT – Page 3 of 18**

subsidiary of Talen Energy Corporation ("**TEC**"), a new company, and was renamed Talen Montana shortly thereafter. PPL-appointed managers and officers (employed by Talen Montana after the Spin-Off), dominated and controlled Talen Montana until December 6, 2016.

## II. PARTIES

8. Plaintiff Talen Montana is a single-member Delaware limited liability company with its principal place of business located in The Woodlands, Texas. Prior to June 1, 2015, Talen Montana, formerly PPL Montana, was a subsidiary of PPL. On June 1, 2015, as a result of the Spin-Off, Talen Montana became a wholly-owned indirect subsidiary of TEC.

9. Defendant PPL is a Pennsylvania corporation with its headquarters in Allentown, Pennsylvania. PPL is a Fortune 500 company and one of the largest utility companies in the United States, with subsidiaries operating in Pennsylvania, Kentucky, Virginia, Tennessee, and the United Kingdom. PPL held PPL Montana as an indirect, wholly-owned subsidiary from 1999 to June 1, 2015. PPL is the parent holding company of Defendants PPL Capital Funding, PPL Energy Funding, and PPL Electric Utilities.

10. Defendant PPL Capital Funding is incorporated in Delaware with its principal place of business in Allentown, Pennsylvania. PPL Capital Funding is a financing subsidiary of PPL that provides financing for the operations of PPL and certain subsidiaries.

11. Defendant PPL Electric Utilities is incorporated in Pennsylvania with its principal place of business in Allentown, Pennsylvania. PPL Electric Utilities is a public utility subsidiary of PPL engaged in the regulated distribution of electricity.

12. Defendant PPL Energy Funding is incorporated in Pennsylvania with its principal place of business in Allentown, Pennsylvania. PPL Energy Funding is a subsidiary of PPL and a former indirect parent of PPL Montana.

## III. JURISDICTION AND VENUE

13. The Court has jurisdiction to consider this matter pursuant to 28 U.S.C. § 1334.

14. This is a core proceeding pursuant to 28 U.S.C. § 157(b).

15. Pursuant to Rule 7008 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**") and Rule 7008-1 of the Bankruptcy Local Rules for the Southern District of Texas, Plaintiff consents to the entry of final orders or judgment by this Court in connection with this adversary proceeding if it is determined that, absent consent of the parties, the Court cannot enter final orders or judgments consistent with Article III of the United States Constitution.

16. Venue is proper before the Court pursuant to 28 U.S.C. § 1409.

## IV. FACTUAL BACKGROUND

**A. PPL purchases MPC's generating assets through PPL Montana in 1999**

17. In 1997, the Montana legislature enacted the Electric Utility Industry Restructuring and Customer Choice Act to deregulate Montana's electric power markets. In response, MPC put its generation assets up for sale and, in 1998, announced that PPL was the successful bidder. The sale to PPL was completed in 1999, with PPL acquiring the assets for more than $769 million.

18. The transaction was a major milestone in PPL's strategy to grow its merchant power business. The assets included 11 hydroelectric facilities and one storage dam in Montana, a partial interest in the 2,100-megawatt four-unit Colstrip coal-fired power plant in southeastern Montana ("**Colstrip**"), and the J.E. Corette coal-fired power plant in Billings, Montana ("**Corette**"). PPL formed PPL Montana to own and operate its new power generation business in Montana.

B.     **PPL enjoyed substantial profits from PPL Montana until its coal-fired assets began weighing on profitability**

19.     The decade following the 1999 acquisition proved very profitable for PPL. The California Power Crisis in 2000 and 2001 and more-volatile power markets in the period after deregulation resulted in power prices in Montana as much as 50% higher than pre-deregulation prices. As a result, PPL Montana was extremely profitable, resulting in more than $325 million in value being transferred to PPL from 1999 to 2012.

20.     By 2012, PPL's fortunes in Montana began to change due to a combination of environmental activism, stricter regulations, increased fuel costs, competition from subsidized renewable generation, and the availability of cheap natural gas as a result of fracking. This combination of factors increased generation costs at Colstrip and Corette and depressed market prices for electricity in Montana and the Pacific Northwest.

21.     On the regulatory front, Montana passed a reregulation law in 2007 allowing NorthWestern, the largest regulated utility in Montana and historically one of PPL Montana's largest customers, to own generation assets in direct competition with PPL Montana. In 2012, Montana's Renewable Portfolio Standard, which required Montana's public utilities to purchase a proportion of their electricity from renewable sources, increased from a required percentage of five percent to ten percent. None of PPL Montana's assets, including the hydroelectric facilities, qualified as renewable sources.

22.     As a result of subsidized renewable generation, NorthWestern's reentry into the generation business, and the loss of the revenue associated with NorthWestern's prior purchases as a PPL customer, PPL Montana's profits plummeted. The problem was particularly acute for the operations of Colstrip because PPL Montana was required to pay rising coal prices under long-term supply contracts as power prices were dropping. As a result, Colstrip and Corette's

financial projections were negative into the foreseeable future. While the hydroelectric assets were projected to generate a positive margin, it was not sufficient to offset the negative margin from Colstrip and Corette.

23. In addition to shifting economics, PPL Montana was increasingly exposed to large environmental obligations and liabilities related to Colstrip. In 2010, the United States Environmental Protection Agency ("**EPA**") published an initial draft of its Coal Combustion Residual ("**CCR**") rules. Although the CCR rules would not be finalized and implemented for several years,[2] it was clear at the time that most coal-fired power plants, including Colstrip, would face strict and costly disposal requirements related to coal ash.

24. PPL Montana also faced millions of dollars in extensive remediation and closure obligations required by an Administrative Order on Consent ("**AOC**") entered into in July 2012 with the Montana Department of Environmental Quality ("**MDEQ**"). The AOC required PPL Montana to provide to MDEQ, within five years, financial assurance for the significant costs associated with the future closure, remediation, and monitoring of Colstrip's ash ponds. As of the date of filing of this Complaint, the financial assurance requirements stood at approximately $113 million. At all relevant times, PPL Montana has owed, and continues to owe, obligations under the AOC.

25. In 2010, the Sierra Club launched its "Beyond Coal" campaign, the "main objective" of which was to "mobiliz[e] grassroots activists in local communities to advocate for the retirement of old and outdated coal plants and to prevent new coal plants from being built." The four Colstrip generating units, which were built in the 1970's and 1980's and together

---

[2] The final version of the CCR rules was issued on December 19, 2014 and published in the Federal Register on April 17, 2015.

comprised the second largest coal-fired plant west of the Mississippi River, were an obvious target for this campaign.

26. In July 2012, as part of its Beyond Coal Campaign, the Sierra Club served notice of intent to sue PPL Montana under the Clean Air Act for civil penalties and injunctive relief concerning Colstrip. A formal lawsuit followed in March 2013. The remedies sought in the litigation included the installation of additional pollution control equipment at a cost of several hundred million dollars and significant financial penalties. Ultimately, the lawsuit was resolved in 2016 pursuant to a settlement requiring the closure of two of the Colstrip plant's four units by July 1, 2022.

27. Many of the same factors affecting the Colstrip plant led to the closure of Corette. In September 2012, PPL Montana announced that the facility would need to be "mothballed" in April 2015, primarily because of increased compliance costs resulting from new EPA emission-reduction regulations that would render the plant uneconomical. The plant was retired in 2015 and has since been demolished.

C. **PPL makes strategic shift away from merchant generation business to focus on regulated utility business**

28. By 2010, PPL started shifting its corporate strategy away from the riskier, more volatile merchant generation business to grow its more stable and profitable regulated utility business. The shift in focus included the acquisition of new regulated utilities and significant capital investments in its existing and new utilities. In 2010, PPL purchased a group of regulated utilities in Kentucky for $7.6 billion and, in 2011, purchased a group of regulated utilities in the United Kingdom for $5.6 billion. PPL incurred substantial debt to fund these acquisitions.

29. PPL's strategy to concentrate on and grow its utility business contemplated significant capital investments in its existing and newly acquired utilities. PPL projected that it

would spend more than $15 billion on capital projects between 2011 and 2015, primarily in its utility businesses.

30. The debt burden from its utility acquisitions and significant capital investments in its utility operations as well as declining margins from its merchant power business (including actual operating losses in Montana), put significant pressure on PPL's dividend. Further, PPL's cash dividend funding needs increased significantly upon conversion of PPL's then-convertible notes (from debt to equity) that were used, in part, to fund PPL's growth plan.

31. As a result, PPL had to do something to shore up its balance sheet. Obvious options would have been to cut PPL's dividend or issue more PPL stock, but these steps would have imposed a cost on PPL's shareholders, which included its officers and directors. To avoid dividend pressure during an aggressive growth phase and avoid a significant stock decline (as the common stock dividend yield supported PPL's stock price), PPL decided, among other things, to extract value from PPL Montana.

D.  **PPL extracts the value out of PPL Montana and leaves it an empty shell to face its mounting liabilities**

32. PPL initially attempted to sell all of PPL Montana's assets, soliciting bids in September 2012. But it quickly became apparent that, while PPL Montana's hydroelectric assets had significant value, its coal-fired assets had none. In fact, NorthWestern submitted a $740 million bid for only PPL Montana's hydroelectric assets, while bidding only $400 million for the hydroelectric assets and the coal-fired assets together—indicating a substantial negative valuation of the coal-fired assets. Realizing that a sale of all of PPL Montana's assets would not generate sufficient cash, PPL decided to sell the hydroelectric assets on their own, extract the value from PPL Montana for use in PPL's growing utility business, and leave PPL Montana with assets insufficient to meet its significant, and growing, liabilities.

33. In September 2013, PPL caused PPL Montana to enter into the agreement to sell PPL Montana's hydroelectric assets to NorthWestern for approximately $900 million. On November 17, 2014, the same day that the sale to NorthWestern closed, PPL caused PPL Montana to make the Distribution, in which the proceeds from the hydroelectric sale were distributed up to PPL and its affiliates in the following sequence:

   a) The PPL-controlled Board of Managers of PPL Montana authorized a distribution of the hydroelectric sale proceeds to PPL Montana Holdings, LLC.

   b) The PPL-controlled Board of Managers of PPL Montana Holdings, LLC then authorized a distribution of the hydroelectric sale proceeds to PPL Generation, LLC.

   c) The PPL-controlled Board of Managers of PPL Generation, LLC then authorized a distribution of the hydroelectric sale proceeds to PPL Energy Supply, LLC.

   d) The PPL-controlled Board of Managers of PPL Energy Supply, LLC then authorized a distribution of the hydroelectric proceeds to Defendant PPL Energy Funding Corporation.

   e) On information and belief, Defendant PPL Energy Funding Corporation distributed the proceeds to PPL, PPL Capital Funding, PPL Electric Utilities Corporation, or other PPL affiliates shortly thereafter.

34. In stripping out PPL Montana's only valuable assets, PPL took advantage of the domination and control that it exercised over PPL Montana. PPL indirectly owned all of PPL Montana through intermediate subsidiaries that PPL also controlled. At the time of the Distribution, PPL (or its affiliates) employed all three managers on PPL Montana's Board of Managers and nearly all of its officers. Two of these PPL-employed managers also served as PPL's Chief Financial Officer and Treasurer, with responsibility for managing PPL's increasing debt load. These board members were also very familiar with PPL Montana's financial condition. One had worked in the power generation business for nearly 34 years, first at the Montana Power Company and then PPL Montana, had been the highest-ranking officer of PPL Montana for more than five years and previously served as the Plant Manager at Colstrip for many years. The PPL

CFO on the Board of Managers was also heavily involved in PPL's mergers and acquisitions activity and would have formulated PPL's plans for selling the PPL Montana assets, taking into account his in-depth knowledge of PPL Montana's assets and liabilities. Accordingly, these Managers gave the necessary approval for the Distribution at PPL's direction and in service of PPL's interests to the detriment of PPL Montana.

35. The Distribution was for no or inadequate value to PPL Montana. Moreover, neither PPL nor the PPL-controlled board members who approved the Distribution implemented any process to determine whether PPL Montana would be solvent after the Distribution or took any steps to protect the interests of PPL Montana and its creditors. Defendants did not obtain a solvency opinion before causing the Distribution. Nor did they retain an external advisor. Defendants did nothing despite their intimate knowledge of PPL Montana's financial condition, the negative valuation NorthWestern placed on the remaining coal-fired assets, their own assessments of the massive environmental liabilities that PPL Montana was facing and their own five-year business plans projecting significant losses. Intent on taking the money out of PPL Montana as part of their strategy to prioritize the utility businesses and preserve PPL's dividend, they simply did not care what impact the Distribution would have on PPL Montana and its creditors.

E. **PPL Completes a Spin-Off of its Unregulated Generation Business**

36. As it pursued the sale of PPL Montana's hydroelectric assets, PPL began a process to divest its entire merchant power business. After its acquisitions of additional regulated generation assets in 2010 and 2011, the percentage of PPL's earnings attributable to its merchant generation business was small, and PPL no longer viewed that segment of its business as core to its strategy. As a result, in 2013, PPL began exploring ways to rid itself of the merchant power business and become a pure-play regulated utility.

37. This effort culminated in the Spin-Off of PPL Energy Supply, LLC, including its subsidiaries PPL Montana, PPL Montana Holdings, LLC, and PPL Generation, LLC. To effectuate the Spin-Off, PPL created two new entities—Talen Energy Corporation and Talen Energy Holdings, Inc.—to hold the businesses spun off from PPL. These entities were owned by PPL until they were separated at the closing of the Spin-Off on June 1, 2015.

F.  **The Distribution rendered PPL Montana insolvent**

38. The Distribution rendered PPL Montana insolvent (disregarding the value of the claims asserted herein). After the Distribution, PPL Montana's ownership interests in Colstrip and Corette were its only material, tangible assets. Defendants knew, at the time of the Distribution, that both facilities were deeply troubled and burdened by mounting obligations. Colstrip had been assigned a fair market valuation of approximately $5 million (in connection with the December 2013 termination of a sale-leaseback arrangement for the Colstrip plant) in an analysis that did not fully account for the emerging environmental liabilities, and Corette would be "mothballed" within a few months' time.

39. Defendants knew, at the time of the Distribution, that PPL Montana's liabilities substantially outstripped the value of its coal-fired assets and that PPL Montana would receive no reasonably equivalent value for the Distribution. Under the 2012 AOC with the MDEQ and the anticipated CCR rules, PPL Montana was expected to incur millions of dollars in costs related to its remediation and closure obligations for Colstrip ash ponds. Projections prepared by Geosyntec, PPL Montana's environmental consultant, estimated that it would cost Colstrip nearly $200 million to comply with the EPA's new CCR rules. Environmental experts estimate that as of the Distribution date, known or knowable costs to comply with the 2012 AOC and the anticipated CCR rules were more than $500 million.

40. At the time of the Distribution, the Asset Retirement Obligation ("**ARO**") associated with the AOC was grossly understated on PPL Montana's books at approximately $1 million—far less than the hundreds of millions of dollars in remediation and closure obligations that PPL Montana faced. As it pursued the sale of PPL Montana assets and the spin of its merchant power business, PPL sought to avoid having to recognize the extent of PPL Montana's environmental exposures on its books. PPL actually instructed PPL Montana to avoid providing an estimate of AOC compliance costs to avoid having to book a liability.

41. Defendants knew that PPL Montana did not have the resources to satisfy these enormous liabilities, PPL Montana's late-2014 business plan projected negative free cash flow over the next five years. No reasonable cash flow projections showed PPL Montana with adequate future income or assets to pay its liabilities.

42. The dire condition of PPL Montana's financial condition was further confirmed by Defendants' knowledge that an arm's-length purchaser, NorthWestern, had assigned a significant negative value for the coal-fired assets during the sales process for PPL Montana's assets.

43. Under all three solvency tests—balance sheet insolvency, inability to pay debts when due, and unreasonably small capital—the Distribution rendered PPL Montana insolvent. And Defendants knew, or recklessly ignored, that the Distribution would have precisely this effect.

**G.   The Rosebud and Delaware Actions**

44. On October 29, 2018, Talen Montana Retirement Plan (the "**Retirement Plan**") and Talen Energy Marketing, LLC (the "**Talen Marketing**") filed a class action complaint against Defendants in Montana state court in Rosebud County on behalf of itself and all similarly situated creditors of Talen Montana for actual and constructive fraudulent transfer

(the "**Rosebud Action**").³  The claims brought in the Rosebud Action all arose from and relate to the Distribution that rendered Talen Montana insolvent and unable to fund obligations owed to creditors as well as current and future employees.  On December 30, 2019, the Retirement Plan filed the Second Amended Complaint removing Talen Marketing as a named party.  On September 11, 2020, the Montana state court—expecting guidance on certain issues from the Delaware Court of Chancery—ordered a stay of the Rosebud Action pending the resolution of the Delaware Action.

45. As of the Petition Date (defined below), the Rosebud Action was pending.

46. On November 30, 2018, PPL filed suit against Plaintiff, and TEC's sponsor, Riverstone Holdings, LLC ("**Riverstone**"), and its affiliates, in the Delaware Court of Chancery, as C.A. No. 2018-0868-JRS (the "**Delaware Action**").  Notably, PPL did not name the Retirement Plan as a defendant in the Delaware Action.  PPL's main contentions in the Delaware Action are: (i) PPL Montana was solvent at the time of the Spin-Off; (ii) claims arising out of the Distribution were time-barred under the spin agreements and Delaware law (6 Del. C. § 18-607(c), which limits liability for members of limited liability companies for wrongful distributions to three years from the date of the distribution); and (iii) Talen Montana and its affiliates breached various provisions of the spin agreements.

**H.    Talen Montana files for chapter 11 protection**

47. On May 9, 2022 (the "**Petition Date**"), Talen Montana, and 71 of its affiliates, commenced the above-captioned chapter 11 cases.

---

³ On the same day, Talen Montana filed a separate lawsuit in Lewis & Clark County, Montana (the "**L&C Action**") against the same group of PPL defendants for breach of fiduciary duty as controllers in connection with the Distribution.  At the time the suit was filed, Talen Montana had no standing to assert the fraudulent transfer claims it is asserting in this complaint and did not purport to do so in the L&C Action.  The L&C Action was subsequently dismissed in deference to the Delaware case described below.

48. Upon filing for bankruptcy, Plaintiff's state law claims became property of the estate pursuant to 11 U.S.C. § 541 and/or Plaintiff has the exclusive right to prosecute claims under 11 U.S.C. §§ 544(b) and 550.

## V. Causes of Action

**COUNT 1 – Actual Fraudulent Transfer under 11 U.S.C. §§ 544(b), 550 and 31-2-333(1)(a), MCA (or other applicable law)**

49. Plaintiff incorporates by reference the foregoing paragraphs and allegations as if set forth fully herein.

50. Under 11 U.S.C. § 544(b), Talen Montana, as a debtor and debtor in possession, may avoid the transfer of an interest of a debtor in property which is avoidable under applicable law by an unsecured creditor of the debtor, including under the Montana Civil Code 31-2-333(1)(a) and other applicable law.

51. On November 17, 2014, Defendants caused the Distribution, in which the proceeds from the sale of PPL Montana's hydroelectric assets were transferred from PPL Montana through a series of conduits to PPL Energy Funding.

52. The Distribution was made with the intent to hinder, delay, or defraud creditors. This intent is evidenced by at least the facts that:

- the Distribution was provided to PPL Energy Funding which, at the time, was an affiliate of PPL Montana;

- the Distribution rendered PPL Montana insolvent;

- the Distribution was not for reasonably equivalent value;

- Defendants concealed from PPL Montana's creditors the fact of its insolvency;

- Defendants concealed from PPL Montana's creditors that they did not intend to leave any support or allowance for PPL Montana's liabilities in exchange for the Distribution; and

- PPL Montana's creditors were harmed by the Distribution.

53. PPL, PPL Capital Funding, and/or PPL Electric Utilities received the Distribution with knowledge that the Distribution rendered PPL Montana insolvent and, thus, did not take the Distribution in good faith. On information and belief, PPL, PPL Capital Funding, and/or PPL Electric Utilities also received the Distribution for no or inadequate value to PPL Montana.

54. As of the Petition Date, there were one or more unsecured creditors of Talen Montana, including the Retirement Plan, that could avoid under applicable law the Distribution.

55. The Distribution, or the value of the Distribution, is avoidable by Talen Montana as an actual fraudulent transfer and should be recovered from Defendants pursuant to 11 U.S.C. §§ 544(b) and 550.

**COUNT 2 –   Constructive Fraudulent Transfer under 11 U.S.C. §§ 544(b), 550; and 31-2-333(1)(b) and 31-2-334, MCA (or other applicable law)**

56. Plaintiff incorporates by reference the foregoing paragraphs and allegations as if set forth fully herein.

57. Under 11 U.S.C. § 544(b), Talen Montana may avoid the transfer of an interest of a debtor in property which is avoidable under applicable law by an unsecured creditor of the debtor, including under the Montana Civil Code 31-2-333(1)(b), 31-2-334, and other applicable law.

58. On November 17, 2014, Defendants caused the Distribution, in which the proceeds from the sale of PPL Montana's hydroelectric assets were transferred from PPL Montana through a series of conduits to PPL Energy Funding.

59. The Distribution was made at a time when PPL Montana was insolvent or rendered PPL Montana insolvent because after the Distribution, PPL Montana's total liabilities were greater than all of PPL Montana's assets at a fair valuation.  By making the Distribution, Defendants

caused PPL Montana to engage in a business or transaction for which PPL's remaining assets were unreasonably small in relation to the Distribution.

60. PPL Montana received less than reasonably equivalent value in exchange for the Distribution.

61. PPL, PPL Capital Funding, and/or PPL Electric Utilities received the Distribution with knowledge that the Distribution rendered PPL Montana insolvent and, thus, did not take the Distribution in good faith. On information and belief, PPL, PPL Capital Funding, and/or PPL Electric Utilities also received the Distribution for no or inadequate value to PPL Montana.

62. As of the Petition Date, there were one or more unsecured creditors of Talen Montana, including the Retirement Plan, that could avoid under applicable law the Distribution.

63. The Distribution, or the value of the Distribution, is avoidable by Talen Montana as a constructive fraudulent transfer and should be recovered from Defendants pursuant to 11 U.S.C. §§ 544(b) and 550.

## VI. PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests relief as follows:

a. Enter judgment that the Distribution is avoidable as an actual fraudulent transfer and that Talen Montana recover the Distribution or the value of the Distribution from Defendants;

b. Enter judgment that the Distribution is avoidable as a constructive fraudulent transfer and that Talen Montana recover the Distribution or the value of the Distribution from Defendants;

c. Enter judgment awarding costs and attorneys' fees, as this Court deems just and proper; and

d. Enter judgment awarding such additional and further relief as this Court deems just and proper under the circumstances.

Dated: May 10, 2022
   Houston, Texas

*/s/ Paul R. Genender*

| | |
|---|---|
| WEIL, GOTSHAL & MANGES LLP | QUINN EMANUEL URQUHART & SULLIVAN LLP |
| Gabriel A. Morgan (24125891) | Karl S. Stern |
| Clifford Carlson (2490024) | Elizabeth M. Devaney |
| 700 Louisiana Street, Suite 1700 | 711 Louisiana Street, Suite 500 |
| Houston, Texas 77002 | Houston, TX 77002 |
| Telephone: (713) 546-5000 | Telephone: 713-221-7000 |
| Facsimile: (713) 224-9511 | Facsimile: 713-221-7100 |
| Email: Gabriel.Morgan@weil.com | Email: karlstern@quinnemanuel.com |
|    Clifford.Carlson@weil.com |    lizdevaney@quinnemanuel.com |

-and-                  -and-

| | |
|---|---|
| WEIL, GOTSHAL & MANGES LLP | QUINN EMANUEL URQUHART & SULLIVAN LLP |
| Matthew S. Barr (*pro hac vice* pending) | Eric Winston (*pro hac vice* pending) |
| Jessica Liou (*pro hac vice* pending) | 865 S. Figueroa Street, 10th Floor |
| Alexander W. Welch (*pro hac vice* pending) | Los Angeles, CA 90017 |
| 767 Fifth Avenue | Telephone: 213-443-3000 |
| New York, New York 10153 | Facsimile: 213-443-3100 |
| Telephone: (212) 310-8000 | Email: ericwinston@quinnemanuel.com |
| Facsimile: (212) 310-8007 | |
| Email: Matt.Barr@weil.com | *Proposed Attorneys for Plaintiff* |
|    Jessica.Liou@weil.com | *Debtor and Debtor in Possession* |
|    Alexander.Welch@weil.com | |

-and-

WEIL, GOTSHAL & MANGES LLP
Paul R. Genender (00790758)
Jake Rutherford (24102439)
200 Crescent Court, Suite 300
Dallas, Texas 75201
Telephone: (214) 746-7877
Facsimile: (214) 746-7777
Email: Paul.Genender@weil.com
   Jake.Rutherford@weil.com

*Proposed Attorneys for Plaintiff as Debtor and Debtor in Possession*

**PLAINTIFF'S ADVERSARY COMPLAINT – Page 18 of 18**